# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

MELVIN D. REED,

                    Plaintiff,

v.                                                    Case No. 11-C-221

LINCARE, INC.,

                    Defendant.

---

# DECISION AND ORDER

---

This Decision and Order addresses Defendant Lincare, Inc.'s ("Lincare")
second motion for summary judgment, and its renewed request for sanctions. Previously, the
Court granted Lincare's summary judgment motion dismissing pro se Plaintiff Melvin D.
Reed's ("Reed") racial discrimination claim arising out of the termination of Reed's
employment.

## Summary Judgment

By its second summary judgment motion, Lincare seeks dismissal of Reed's
hostile work environment claim, contending that the racially inappropriate comments of which
Reed complains are unfortunate but they are not severe or pervasive enough to alter the
conditions of his employment. Lincare also asserts there is no basis for employer liability
because it had an anti-harassment policy that included an effective complaint procedure.

Lincare states that Reed did not use that system or use any other means to make Lincare aware of the alleged harassment.

Reed asserts genuine issues of material fact exist on the issue of pretext and that Lincare's summary judgment motion should be denied. (Pl.'s Mot. Deny Def.'s Mot. Summary J. 3.) (ECF No. 7.) Reed also reiterates that the Court should recuse itself from this matter for the reasons presented in his November 21, 2011, motion to recuse brief. Again because Reed has not presented a reason for recusal under the applicable statute, the Court declines. (*See* Court's December 5, 2011, Decision and Order 3-4.) (ECF No. 37.) *See also Lim v. Courtcall Inc.,* 683 F.3d 378, 380 (7th Cir. 2012).

The standards for summary judgment and the statement of relevant facts are similar to those in the Court's prior decision. However, to create a complete and understandable decision they are reiterated.

## SUMMARY JUDGMENT MOTION

With respect to Lincare's current summary judgment motion, the following standards apply. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). This Court must view the facts in the light most favorable to Reed, resolving all evidentiary conflicts in his favor and according him the benefit of all reasonable inferences that may be drawn from the record. *See O'Leary v. Accretive Health Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

2

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Put another way, summary judgment is appropriate when there are no genuine factual issues that could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986).

A plaintiff may prove a Title VII discrimination claim either directly or indirectly. *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733-34 (7th Cir. 2011). To avoid summary judgment under the direct approach, the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision. *Id.* A plaintiff also may proceed under the indirect, burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Although the moving party bears the initial burden of informing the Court of the basis for its motion, it may satisfy its burden by simply showing or pointing out to the Court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 325. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to withstand summary judgment. *See Anderson*, 477 U.S. at 252.

Reed was provided notice of his obligations to respond to the proposed findings of fact, as required by *Timms v. Frank*, 953 F.2d 281, 285 (7th Cir. 1992). (*See* Def.'s Notice Mot. & Mot. Summary J. Hostile Work Environment Claim.) (ECF No. 49.) Despite being

3

advised that he was required to file a response to Lincare's statement of facts and that the Court would deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment, Reed did not respond to Lincare's statement of facts. However, Reed filed two affidavits in response to Lincare's motion. (ECF Nos. 61 & 61-6.) He also filed several exhibits. (ECF Nos. 61-1-61-5.)

The following relevant facts are based on Lincare's uncontroverted statements of facts, *See* Civil Local Rule 56(b)(4), as augmented by additional facts presented in the two affidavits filed by Reed, and his verified Complaint, to the extent those facts are undisputed.[1]

### Relevant Facts[2]

Lincare is an oxygen delivery and service company with a facility in Menomonee Falls, Wisconsin. Reed, who is African-American, is an adult resident of the state of Wisconsin. Angela Emley ("Emley"), who is Caucasian, was the center manager at Lincare's Menomonee Falls facility. Nicholas Bach ("Bach") was the area manager responsible for the Menomonee Falls facility.

Emley interviewed Reed for a job at Lincare. During the interview, Emley explained the requirements of Lincare's service representative position, including that a person employed in that position generally worked more than 40 hours a week. Emley believes she also explained the importance of service representatives having on-call responsibilities during

---

[1] Reed has sworn under penalty of perjury that the allegations of his Complaint are true and correct and has thus verified his Complaint under 28 U.S.C. § 1746. Therefore, the Court has considered the factual allegations of Reed's Complaint as if they were made in an affidavit. *See Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). However, unsupported, conclusory statements and legal arguments are not recitations of "fact" to which an affiant is competent to testify." *Id*. at 862.

[2] Citations to evidentiary materials filed by Reed and all quoted excerpts, including undisputed facts, are provided.

4

nights and weekends. Reed does not recall whether Emley discussed the sharing of on-call responsibilities among the three service representatives. However, Reed recalls that the subject of school was not discussed. Emley offered Reed a job at Lincare as a service representative. Emley was Reed's supervisor.

On Wednesday, June 18, 2008, Reed began working for Lincare as a service representative at its Menomonee Falls facility. That day Reed saw a written statement about the on-call job requirement and he signed the service representative job description that said the on-call system was on a "as scheduled basis." (Reed Aff. ¶ 12.) On his first day of work, Emley gave Reed a copy of Lincare's Employee Handbook. Lincare's Employee Handbook included the following provisions:

> **ANTI-DISCRIMINATION/ANTI-HARASSMENT/ADA POLICIES**
>
> All employees have the right to work in an environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive or disruptive, including sexual and racial harassment. Lincare does not and will not tolerate discrimination against, or harassment of or by, Lincare's employees . . . . Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as business trips, business meetings and business-related social events.
>
> **Applicability of Policies**
>
> All employees and applicants are covered by these policies and are strictly prohibited from engaging in any form or discriminatory or harassing conduct.
>
> * * * * *

5

## POLICY CONCERNING HARASSMENT/SEXUAL AND RACIAL HARASSMENT

Lincare regards harassment, including sexual and racial harassment, as a form of misconduct that undermines the integrity of the employment relationship. . . . . Lincare prohibits sexual and racial harassment in the workplace, whether committed by supervisory or non-supervisory personnel, consultants, customers or vendors.

\* \* \* \* \*

### Reporting Procedure

If you believe you have been discriminated against or harassed or you have any concerns or suspicions of discrimination or harassment in the workplace against you or anyone else, you are required to immediately notify any one of the persons listed below based on your location:

| Field locations (Centers, Call Centers, Specialty Pharmacies (CA, MO); infusion pharmacies) | Region Manager<br>Employee Relations Director<br>Human Resources Manager |
|---|---|

\* \* \* \* \*

### Investigation of Reports

It is the responsibility of the Employee Relations Department to investigate any complaint of discrimination or harassment. . . .

### No Retaliation

Lincare prohibits retaliation against any individual who reports discrimination or harassment or participates in an investigation of such reports. . . .

(Crofts Aff.[3] ¶ 2, Ex. 1, at 7-8.)

---

[3]Crofts was known as Emley at the time she hired Reed and Reed was employed by Lincare.

On the second day of Reed's employment, he was assigned to work with Jeff Sekely ("Sekely"), a fellow service representative, so that he could receive on-the-job training. Sekely had been a service representative with Lincare since 2002. Sekely is a white male. (Reed Aff. ¶ 13.) Lincare did not provide formal training for Sekely in sensitivity or in how to train a new employee. (*Id*. at ¶¶ 14-15.) Sekely did not have the authority to hire, fire, or discipline any Lincare employees.

During the first day they worked together, Reed told Sekely he was thinking about going back to school one day. Reed believed his comment made Sekely angry. Sekely told Reed that going back to school would take time away from Reed's job with Lincare. Reed told Sekely that his availability would not be a problem. (*Id*. at ¶ 17.)

On Friday June 20, 2008, Sekely asked Reed to call a host of Lincare's clients. (*Id.* at ¶ 20.) Later, Sekely commented that he had asked Reed to call the black clients since those clients would trust Reed more because Reed is black. (*Id.* at ¶ 22.) Sekely said that blacks who didn't let Lincare's service representatives into their homes were "dysfunctional." (*Id.* at ¶ 23.) Reed told Sekely that there may be a lack of trust and cultural reasons why people of color were reluctant to open their homes to white service representatives. (*Id.* at ¶ 24.)

Sekely talked to Emley about the prospect of Reed going back to school. The next day, Friday, June 20, 2008, Emley asked Reed about his plans to go back to school. Reed told Emley he was thinking about doing it, one day. *(Id*. at ¶ 19.) Emley was concerned about the impact of Reed's return to school on his availability to work overtime and to work on-call.

(Emley Aff. ¶ 7.)  From Reed's perspective, Emley was unconcerned about the issue.  (Reed Aff. ¶ 20.)  During the conversation, Reed did not say anything about Sekely making inappropriate racial comments.

Reed worked with Sekely on Monday, June 23, and Tuesday, June 24, 2008.  On one of those two days, Reed stated that he did not want to work too many hours because he was getting too old for it and he wanted to spend time with his teenage daughter.  Once again, Reed believed that his comment made Sekely angry.  The two did not discuss how many hours would be too many hours for Reed.  (*Id.* at ¶ 25.)  Sekely stated that Reed's desire to avoid working too many hours would interfere with his job and that maybe this job was not going to work out for him.  Reed states that, during this exchange, Sekely poked him twice in the arm.  (*Id.* at ¶ 26.)  Reed told Sekely that he had no problem working extra hours and that he should calm down.  (*Id.* at ¶ 27.)

During the week Sekely and Reed worked together, Sekely made comments that black children in public schools should not be receiving free breakfasts and lunches, and that the reason that African-Americans do not do as well is because they do not value education and marriage as much.  (*Id.* at ¶ 29.)  Reed countered that racism is still a big part of why blacks do not do as well as whites.  (*Id.* at ¶ 30.)  Sekely disagreed and the discussion ended.  (*Id.* at ¶ 31.)

On an occasion when Sekely and Reed were servicing a client in the City of Milwaukee, after observing some black teenagers congregating outside across the street, Sekely asked Reed twice to check that the work van doors were locked.  (*Id.* at ¶ 32.)  Sekely

never asked Reed to lock the van when they were servicing clients in more affluent areas. (*Id.* at ¶ 33.)

Reed considered talking to Emley about Sekely, but because he was new to the job he decided he would wait to see if Sekely's behavior continued. (*Id.* at ¶ 34.) Reed never complained about Sekely or made comments which led Emley to believe Sekely had made any inappropriate racial comments. According to Reed, he did his work "satisfactorily everyday [sic] to the best of [his] knowledge and came to work every day on time and stayed when [he] was asked to work overtime." (Compl. 5 ¶ 6 (unnumbered).) During Reed's employment, Emley did not see or hear anything which led her to believe that any Lincare employee had made inappropriate racial comments.

On Wednesday, June 25, 2008, Reed called in sick. He had flu-like symptoms. (Reed Aff. ¶ 35.)

Consistent with Emley's general practice to check on a new employee's progress, Emley talked to Sekely for his perspective on how Reed had been doing during the preceding four days. (Emley Aff. ¶ 7.) Sekely told Emley that he did not think Reed was committed to the job because he did not ask questions about the duties and responsibilities of the job and did not seem interested in learning about other requirements such as the paperwork. (*Id.*) Sekely stated that at times it appeared Reed had fallen asleep and Reed wanted to stop to eat several times during the day. (*Id.*) Sekely also related that Reed seemed more concerned about himself than the patients they were servicing. (*Id.*) Sekely also said that Reed brought up topics that were sexual in nature describing human anatomy, although

that did not really bother Sekely. (*Id.*) It "bothered" Emley that Reed was discussing such subjects. (*Id.*) Sekely also expressed concern about Reed being out on a route of his own without supervision and requested that he not be required to ride with Reed in the future because Reed did not seem to care about the job. (*Id.*)

Later that day, Emley called Reed at home and terminated his employment. Emley was the person who decided to end Reed's employment. Emley determined Reed was not a good fit for the service representative position in Menomonee Falls. Emley told Reed he was not the right person for the job or a good fit. (Reed Aff. ¶ 37.) During the conversation, Reed told Emley that if the discharge decision was based on negative information from Sekely, he had the right to rebut it. (*Id.* at ¶ 39.) Reed did not say anything about Sekely making racially inappropriate comments. At Reed's request, Emley provided her immediate supervisor's name – Bach. (*Id.* at ¶ 42.) Reed told Emley "[t]his isn't over." (*Id.*)

After his discharge, Reed called Bach. Reed did not say anything about any co-worker making inappropriate racial comments. Bach has not seen, heard, or received reports of Sekely making racially inappropriate comments. Bach told Reed he would "look into" the matter and get back to him, but did not do so. (*Id.* at ¶ 43.)

On or about June 26, 2008, Reed wrote to Beau Hoy ("Hoy"), a regional manager for Lincare, stating that he thought he had been illegally discharged and informing him that he was African-American. (*Id.* at ¶ 44.) In that letter, Reed discussed his conversations with Sekely about his stated desire to go back to school and to avoid working extended hours. The letter did not mention Sekely making racially inappropriate comments.

Hoy responded to Reed by a letter dated July 1, 2008, informing that Reed that his termination status would not be changed.  (*Id*. at ¶ 45.)

On August 29, 2008, Reed returned an exit questionnaire to Lincare.  (*Id*. at ¶ 46.)  Reed wrote:

> I was fired after working for the company for only 5 days.  I hadn't done anything wrong.  The manager fired me after talking to the employee who was responsible for training me, but not to me.  This employee got angry when I told him I was thinking about going back to school, agitated when I informed him I wanted to have free time in the evening other than work but more to the point, he made some disparaging remarks about African-Americans, which I am.  He obviously influenced the manager to terminate me.

(*Id*., Ex. 5 (ECF No. 61-5).)

On October 16, 2008, Reed filed an administrative complaint against Lincare alleging racial discrimination.  On December 21, 2010, the Equal Employment Opportunity Commission ("EEOC") to issued Reed a "Notice of Right to Sue."  On March 1, 2011, Reed filed this action alleging that Lincare discriminated against him based on his race, African-American, because it subjected him to a hostile work environment by forcing him to train under a "bigoted white employee," and then terminating his employment based on the misrepresentations of the same employee in violation of the Federal Civil Rights Act of 1991 as amended and Title VII.  (Compl. 6.)

### *Analysis*

With respect to Reed's hostile work environment claim, Title VII provides, in part, that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any

individual, or . . . to discriminate against any individual with respect to his  . . . race, color, . . . [or] sex . . . ."  42 U.S.C. § 2000e-2(a).  Lincare maintains that Reed's hostile work environment claim should be dismissed.

*Hostile Work Environment  Claim*

To survive Lincare's summary judgment motion on this claim, Reed must demonstrate that (1) his work environment was both objectively and subjectively offensive; (2) that the harassment was based on his race; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability.  *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011).  To determine whether a working environment is "hostile," courts may consider "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance*." Scruggs v. Garst Seed Co.,* 587 F.3d 832, 840 (7th Cir. 2009).  "[T]he environment must be 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Smith v. N.E. Ill. Univ.,* 388 F.3d 559, 566 (7th Cir. 2004) (citation omitted).

Reed was employed by Lincare for one week.  The incidents he relies upon as creating a hostile work environment are limited.  Reed relies upon Sekely's responses to Reed's comments about returning to school, and about working too many hours.  During the latter incident, Sekely poked Reed in the arm twice.  Reed also relies upon Sekely's statements that black children in public schools should not be receiving free breakfasts and lunches, and that the reason that African-Americans do not do as well is because they do not value

education and marriage as much. Reed also relies upon the difference in Sekely's behavior when they serviced clients in the City of Milwaukee (which has a high number of African-American residents) after observing some black teenagers congregating outside across the street, as compared to when they were servicing clients in more affluent areas.

Viewed in the light most favorable to Reed, Sekely's angry responses to Reed's statements about returning to school and wanting not to be working long hours including poking Reed's arm twice were rather extreme. However, neither have any apparent connection to Reed's race. Instead, both issues are related to Reed's availability to do the service representative work that Sekely was training Reed to perform. The remainder of the statements and the conduct are race-related. These comments and behavior were distressing to Reed and objectively offensive. However, there is no indication that they interfered with Reed's work performance. The undisputed facts establish that after exchanging their opposing views on the subjects of free meals for school children and the reason African-Americans may not be not advancing as desired, the two men dropped the discussion. These exchanges were not severe or physically threatening. Although Reed missed work on June 25, 2008, he was ill. Reed did not mention Sekely's comments to Lincare until almost two months after the termination of his employment. Moreover, Reed described them only as "disparaging" remarks. Reed's own description of the race-related comments falls short of a hostile work environment.

Reed was also offended by Sekely's request that Reed check twice that the van was locked. Nonetheless, Sekely was attempting to protect property entrusted to him by

Lincare. Sekely's request was not physically threatening or humiliating and did not interfere with Reed's job performance. Based on the limited evidence of discriminatory conduct, the Court concludes that Reed was not subjected to a hostile work environment.

Additionally, an employer is not strictly liable for racial harassment perpetrated by its employees. *See, e.g., Porter v. Erie Foods Int'l, Inc.,* 576 F.3d 629, 636 (7th Cir. 2009). The standard for employer liability depends on whether the alleged harasser was the plaintiff's supervisor, instead of merely a co-worker. *See, e.g., Faragher v. City of Boca Raton,* 524 U.S. 775, 807-08 (1998). There is no dispute that Reed's alleged harasser, Sekely, was not Reed's supervisor. Therefore, the employer, Lincare, is only liable where the plaintiff proves that the employer has been negligent either in discovering or remedying the harassment. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505-06 (7th Cir. 2004).

An employee must make a concerted effort to inform the employer that a problem exists. *See id.* at 506 (citing *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999)). If the employer has designated a channel for complaints about harassment, "this [point] person becomes the natural channel for the making and forwarding of complaints and complainants can be expected to utilize it in the normal case." *Young v. Bayer Corp.,* 123 F.3d 672, 674 (7th Cir. 1997). If an employer has not designated a point person, the complainant may give notice to a "department head" or someone that "the complainant *reasonably believed* was authorized to receive and forward (or respond to) a complaint of harassment." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998).

14

The exact chronology of race-related comments and conduct in this case is not clear. However, Reed did not mention Sekely's treatment of him during Reed's conversation with Emley on Friday, June 20, 2008. Furthermore, in conversing with Bach and writing Hoy after his termination, Reed did not include any information about Sekely's comments or actions. Reed did not inform Lincare of Sekely's racially offensive comments until more than two months after his employment had been terminated. Thus, there is no basis for employer liability.

In addition, even if Reed were found to have established a hostile work environment claim, the Court relies upon its analysis in the Decision and Order addressing Lincare's motion for summary judgment on Reed's racial discrimination claim finding that Lincare has presented a legitimate non-discriminatory reason for terminating Reed's employment and Reed has not presented any evidence from which a reasonable jury could infer that Lincare's reasons for discharging Reed are unworthy of credence. (*See* Court's January 26, 2012, Decision and Order at 9-11.) (ECF No. 43.)

Reed cites *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001), for the proposition that the Court need not abandon good reason and common sense in assessing an whether an employer's belief is honest. Reed suggests that Sekely is not to be believed because he called black people dysfunctional and is now trying to deny it. Lincare has not filed any affidavit of Sekely. Consequently, Reed's statement that Sekely is changing his position on the claimed dysfunction of black people is unclear.

Furthermore, Emley stated she discharged Reed from the service representative position because he was not a good fit for the position. She did not go into greater detail. Although Sekely told Emley that Reed had talked about going back to school, she talked to Reed directly about that issue.

Reed also suggests that Emley changed her story because she initially told Hoy that she terminated Reed's employment because he called in sick. However, there is no evidence in the record to support Reed's contention that Emley changed her story about her reasons for terminating Reed's employment.

Despite construing the evidence in the light most favorable to Reed, he has not submitted sufficient evidence to permit a reasonable jury to find that he was subjected to a hostile work environment because of his race. Accordingly, Lincare's motion for summary judgment with respect to Reed's hostile work environment claim is granted.

## MOTION FOR SANCTIONS

Lincare has renewed its motion for monetary sanctions against Reed pursuant to Rule 11(b)(1) of the Federal Rules of Civil Procedure. In its motion, Lincare maintains that three years earlier Reed warned Lincare that if it refused his settlement demand, he would use the available administrative and judicial proceedings to delay this litigation and to make it as costly and burdensome as possible. Lincare states that, true to his word, Reed has pursued his claims against Lincare for the improper purposes of harassing Lincare, causing unnecessary delays and needlessly increasing the cost of this litigation, and his conduct should be sanctioned under Rule 11. Lincare requests $62,710.34 in attorney fees as sanctions.

Reed opposes the motion indicating that he made it clear to Lincare that he was prepared to pursue his legal right to obtain redress and to exhaust every avenue available to him; and that his action have not been threats but acts of principle. He also states that the conduct of Lincare's counsel is the true reason that this action has continued and that the Wisconsin Department of Workforce Development ("DWD") Administrative Law Judge ("ALJ") who presided over Reed's administrative charge against Lincare was biased against Reed.

Rule 11 of the Federal Rules of Civil Procedure prohibits parties from pursuing frivolous claims and from presenting any claim or defense for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Fed. R. Civ. P. 11(b)(1). *See also, Jimenez v. Madison Area Tech. Coll.*, 321 F.3d 652, 656 (7th Cir. 2003). "The central goal of Rule 11 is to deter abusive litigation practices." *Corley v. Rosewood Care Ctr., Inc. of Peoria,* 388 F.3d 990, 1013 (7th Cir. 2004) (citation omitted.) Reed's pro se status does not shield him from Rule 11 sanctions because the Rule explicitly applies to unrepresented parties; however, the Court may take into account the special circumstances that often arise in pro se situations. *Vukadinovich v. McCarthy,* 901 F.2d 1439, 1445 (7th Cir. 1990). Specifically, the 1993 Advisory Committee Notes to Rule 11 explain that courts may consider whether the improper conduct was "willful, or negligent" and whether the responsible person is "trained in the law" in determining whether to impose sanctions. *Id*. (citing Fed. R. Civ. P. 11 Notes of Advisory Committee on Rules, 1993 Amendment.) *See also, Reed v. Great Lakes Cos., Inc.*, 330 F.3d 931, 936 (7th Cir. 2003).

17

The test of Rule 11 is objective. *Thorton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir. 1986). Courts must determine if there is sufficient evidence in the record to show an improper purpose when imposing Rule 11 sanctions. *See Vollmer v. Selden,* 350 F.3d 656, 661 (7th Cir. 2003) (vacating the imposition of Rule 11 sanctions, finding that there was not sufficient evidence in the record to show the improper purpose of coercing a fee).

"[T]he district court enjoys broad discretion in setting a sanction award that it believes will serve the deterrent purpose of Rule 11" and "may direct the offending party to pay the other party's reasonable attorney's fees." *See Divane v. Krull Elec. Co.,* 319 F.3d 307, 314 (7th Cir. 2003); *Fries v. Helsper*, 146 F.3d 452, 459 (7th Cir. 1998) (stating that district courts have "significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person(s)."(citation omitted.))

By letter dated November 4, 2008, Reed informed Lincare with respect to his administrative action, stating:

> Getting right to the point, **this is my attempt to try to settle this matter before this case is investigated by the department and ultimately goes to a hearing.** There are a number of reasons I believe this would be in both parties' best interest.
>
> First, it will eliminate the need for the Respondent to go through a lengthy, probing and potentially expensive discovery process. I can assure you that I am prepared to leave no stone unturned in my quest to get as much information from the Respondent before a hearing. I am sure to subpoena a multitude of documents, including personnel files, time card verifications, customer records and even company financial statements from the

18

Respondent. Are you sure you are willing to go through this type of scrutiny? There's always the probability that I will instead, pursue this case at the federal level. In fact, you can count on it.

A settlement now will eliminate the need to [sic] for us to go to federal court, where a jury will be seated to consider punitive damages, (which can go into the hundreds of thousands of dollars), front and back pay along with pain and suffering. Even if I didn't [sic] prevail immediately here, I will surely appeal this case to the United States Court of Appeals. Sounds expensive - for the Respondent. . . .

No one knows better than I do that these issues have poor chances of settling once the lawyers get involved. Advising clients to battle in court with potential and former associates is how these guys make their money. I'd like to remind you that I'll be spending my money, while your lawyers will be spending your money. . . .

The real issue is do we want to spend the next <u>few years</u> looking behind, or end this matter now and look ahead. You can hold on to the usual extortion accusations against me if you wish, but all I am trying to do is see if two parties who disagree, can find some common ground. Hence, I am willing to settle this case confidentially now and forgo any additional appeals for the sum of $15,000. . . .

If the answer is no, I will accept that and we can all prepare for the long litigation process ahead. . . . I can assure you, I do not take lightly the Respondent thoughtlessly and illegally taking food out of me and my daughter's mouth. Accordingly, in the alternative to a settlement now, I'll fight this case until Chelsea Clinton is running for president.

(Murray Aff. filed Nov. 4, 2011 ("Murray Aff."), ¶ 6, Ex. 4.) (ECF Nos. 27 & 27-4.)

By letter dated May 11, 2010, Reed wrote John E. Murray ("Murray"), counsel for Lincare, as follows:

Though I know this is a colossal waste of time, the ALJ always wants to know if the parties have attempted settlement

negotiations. Accordingly, this is my official effort to see if me and your client. . . can find common ground and settle this issue without proceeding to what are sure to be multiple hearings and trials.

You see, I am certain to eventually bring this issue to federal court where the prospect of [a] long discovery process is not only a possibility but guaranteed. . . In addition at the federal level, punitive damages come into play which could mount into the hundred[s] of thousands of dollars, should I prevail. There is always the possibility that your client could lose. This brings up the issue of public scrutiny, embarrassment and the court ordered decrees and remedies that will be levied against your client.

. . . . Finally, should I lose at the lower court level, I am sure to file an appeal. (And since you know my history, you know I'm not bluffing.) All this sounds expensive. Not for me, but for your client.

(*Id*. at ¶ 7, Ex. 5 (ECF No. 27-5).)

On about November 8, 2010, Reed left a voicemail message for Murray demanding a settlement of $10,000, and stating that the amount was not negotiable. (*Id*. at ¶ 13.) Reed also stated that if Lincare did not pay that amount he would appeal any adverse decision arising out of the hearing scheduled for November 18, 2010, or he would dismiss his administrative charge and pursue his claims against Lincare in federal court. (*Id*.) On November 17, 2010, Reed informed Murray that he was dismissing the administrative action so he could pursue a federal action against Lincare. (*Id*. at ¶ 14.) Murray filed the Complaint in this action on March 1, 2011. (ECF No. 1.)

Reed's litigation history in other matters is also relevant to the Court's analysis of Lincare's motion for sanctions and consideration of a sanction which will be sufficient to deter future misconduct by Reed. *See Great Lakes,* 330 F.3d at 936-37. Reed has a lengthy

litigation history. He disclosed 31 other employment discrimination claims in his Complaint. In *Reed v. Innovative Health & Fitness Ltd.*, 359 F.App'x 875, 876 (7th Cir. 2008), the court stated that Reed's litigation history included 26 employment discrimination cases before the Wisconsin Equal Rights Division ("ERD") and 14 employment discrimination claims in federal court against dozens of employers.

More recently, in *Reed v. Heiser Ford, Inc.*, (ERD Case No. 200504107), the ALJ issued a nonfinal decision containing a detailed review of Reed's extensive litigation history. (Murray Aff. ¶ 15, Ex. 11 (ECF No. 27-11), 4-19.) The ALJ identified 31 administrative charges filed by Reed between 1983 and April 11, 2007. (*Id.*, Ex. 11, 4.) The ALJ s analysis of the 31 claims and Reed's deposition testimony show that Reed has consistently used the litigation process for improper purposes. For example, annually Reed submits hundreds of employment applications to Wisconsin employers. (*Id.*, Ex. 11, 44; Murray Aff. ¶ 16, Ex. 12 (Portions of Reed Dep. in *Reed v. Heiser Ford, Inc.,* ERD Case No. 200504107) (ECF No. 27-12), 85:6-18.) When offered a job, typically Reed works for that employer for a short time, often less than one month. *Great Lakes*, 330 F.3d at 936. He then brings claims of employment discrimination against his former employers, and against prospective employers who rejected him during the application process. *Id.* (*See also* Murray Aff. ¶ 15, Ex. 11, 44.) Reed has used the discovery process at the administrative level "as a means of conducting fishing expeditions to find out if there was <u>any</u> information to support his complaints of employment discrimination." (*Id.*, Ex. 11, 44; Murray Aff. ¶ 16, Ex. 12, 86:15-87:18.)

The ALJ found that although Reed is not often successful, Reed uses the ERD and federal court process to try to obtain settlements from the employers against whom he filed his many employment discrimination complaints. (Murray Aff. ¶ 15, Ex. 11, 44.). Reed has acknowledged reaching a settlement with several defendants. (Murray Aff. ¶ 2, Ex. 1 (Excerpts of Reed Dep., *Reed v. Lincare,* ERD Case No. CR2008034021) (ECF No. 27-1) 105:15-16; 119:15-20; 121:23-122:14; 133:6-11; 135:16-136:4; 138:25-139:18; Murray Aff. ¶ 16, Ex. 12, 70:7-9; 73:1-12; 80:23-81:7; 81:23-82:14.)

When employers have rejected Reed's settlement demands, his litigation strategy becomes punitive: In all known cases since 1998 where Reed had the option of continuing his complaint against a respondent in federal court if his ERD proceedings ceased, Reed prolonged his ERD case until his complaint was either dismissed by the ERD for cause or he withdrew his complaint to proceed in federal court. (*See* Murray Aff. ¶ 15, Ex. 11, 45.) In those cases where the pursuit of a federal complaint was an option, Reed used the ERD's rehearing procedures until the time just before he would be forced to try the case before the ERD. (*Id.*, Ex. 11, 45.) At that time, Reed would either withdraw his complaint and continue his claim in federal court or create a situation that resulted in his ERD complaint being dismissed. (*Id.*, Ex. 11, 45.)

Reed's conduct and statements prior to filing this federal action considered together with his overall litigation pattern in administrative and federal proceedings, demonstrate that Reed has filed this weak federal action for an improper purpose; that is, to attempt to coerce Lincare to reach a financial settlement with him in order to avoid the

expenses and other risks inherent in litigation. The federal courts are bastions for the protection and vindication of civil rights. To manufacture, essentially out of whole cloth, claims of civil rights violations for the purpose of monetary gain depreciates the seriousness of these types of actions, delays the consideration of meritorious claims of other litigants and imposes unwarranted costs upon the parties alleged to have committed these violations while placing undue burdens upon an already busy Court. Federal litigation may not be used as a punishment against parties who legitimately reject a demand to settle an extremely marginal claim. Under Rule 11, this Court may impose sanctions based on Reed's improper use of the litigation process and to deter him from using litigation for improper purposes in the future.

Lincare's request for attorney fees includes the fees incurred during the administrative and these court proceedings. However, this Court may impose Rule 11 sanctions only based on filings before it. *See* Fed. R. Civ. P. 11(b). As of December 4, 2011, Lincare had incurred $13,797.50 in attorney fees in conjunction with this federal action. (Murray Aff. ¶ 17.) No doubt that amount has increased in the subsequent months.

Reed was allowed to proceed *in forma pauperis* in this action after considering the financial information Reed previously submitted. (*See* Court's March 4, 2011, Decision and Order.) Based on this finding, requiring Reed to pay $5,000 of the attorney fees that Lincare incurred in this litigation is an appropriate sanction to impose because of his improper use of this federal litigation process. It will also deter him from using litigation for improper purposes in the future. Reed is also advised that the courts within this judicial appellate circuit have the power to issue an injunction imposing pre-filing restrictions on a vexatious litigant.

23

*See, e.g., McCready v. eBay, Inc.,* 453 F.3d 882, 892-93 (7th Cir. 2006) (ordering a vexatious pro se litigant to show cause why he should not be barred from filing papers in the federal courts of the Seventh Circuit for a period of at least two years); *Support Sys. Int'l, Inc. v. Mack,* 45 F.3d 185, 186-87 (7th Cir. 1995) (imposing a two-year prohibition of new filings in the federal courts of this Circuit on a vexatious litigant).  While Lincare has not requested such an injunction, imposition of such an injunction is appropriate in this case.  Reed is banned from filing any papers in this District until the $5,000 in attorney fees is paid.  The exceptions to this ban are for any criminal case in which Reed is a defendant, any application  for a writ of habeas corpus that he may want to file, *see Mack,* 45 F.3d at 186, and any situation in which Reed is filing papers in a purely defensive mode, where he is cast as a defendant or respondent.  *See Matter of Skupniewitz,* 73 F.3d 702, 705 (7th Cir. 1996).  Reed may submit to this Court, no earlier than two years from the date of this Order, a motion to modify or rescind the Order.  *Id.*

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Lincare's second motion for summary judgment  (ECF No. 49 ) is **GRANTED** with respect to Reed's hostile work environment claim;

Lincare's motion for Rule 11 sanctions (ECF No. 25) is **GRANTED** in part and **DENIED** in part;

Reed **MUST PAY** Lincare **$5,000** in attorney fees;

24

The Clerk of Court **MUST NOT** accept any new filings from Reed until the $5,000 in attorney fees is paid;

**No earlier than two years from the date of this Order**, Reed may submit to this Court a motion to modify or rescind the Order;

This action is **DISMISSED**;

The Clerk of Court is **DIRECTED** to enter judgment accordingly; and

Lincare **MAY FILE** a bill of costs with the Clerk of Court.

Dated at Milwaukee, Wisconsin this 21st day of November, 2012.

**BY THE COURT**

Hon. Rudolph T. Randa
U.S. District Judge